(No. 33134.—

The People of the State of Illinois, Defendant in Error, *vs.* William Tensley, Plaintiff in Error.

*Opinion filed October 25, 1954.*

William Tensley, *pro se.*

Latham Castle, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (John T. Gallagher, Rudolph L. Janega, and Arthur F. Manning, all of Chicago, of counsel,) for the People.

Mr. Justice Hershey delivered the opinion of the court:

The plaintiff in error, William Tensley, hereinafter referred to as defendant, was indicted in the criminal court of Cook County for rape. He waived a jury, and upon trial before the court was found guilty and sentenced to five years imprisonment. He prosecutes a writ of error to this court.

In urging this court to reverse the judgment of conviction, he contends as follows: (1) the judgment and finding is contrary to law and to the evidence because the State failed to prove beyond a reasonable doubt the guilt of the defendant; (2) the trial court erred in overruling defendant's motion for a finding of not guilty at the close of the State's case; (3) the court erred in overruling defendant's motion for a new trial; (4) the court erred in overruling defendant's motion in arrest of judgment; and (5) the comments of the trial judge show that the defendant was not given the fair and impartial trial guaranteed by the constitution of the United States and the constitution of the State of Illinois.

Two witnesses testified for the State, the prosecutrix, and police officer John Griffith who investigated the case

and was present during the interrogation of the defendant after his arrest.

The prosecutrix, twenty-four years old and unmarried at the time of the alleged crime, testified to the following: the defendant came to her home on April 17, 1952, between 9 and 9:30 at night, picked her up and drove her to a friend's house, identified only as Betty. The prosecutrix's roommate, Martha, and Eddie Sardon, who was going with Martha at the time but has since married the prosecutrix, came along. Later, prosecutrix and the defendant left the house to take Betty's husband to an elevated station. They returned several times to see if Eddie and Martha were ready to leave but were informed each time that they wished to remain. It was decided that the defendant would drive the prosecutrix home alone. On the way, the defendant told her he was going by his godmother's house, but he drove into an alley and parked. It was then between 11 o'clock and midnight. He asked her if she was going out with him again, and she said she was not. He then said he may as well make a night of it and asked her if she knew what he was fixing to do. She replied that she did but that he was going to get in trouble. But he said it didn't matter if he died the next day and began choking her and pulling her over the back seat. As she screamed, he warned her to stop screaming and "rassling" with him or he would kill her and leave her in the alley. He then forced her in the back seat, and as he was still choking her, forced her to submit to sexual intercourse.

The prosecutrix further testified that the defendant then drove her home, and as he left warned her not to tell anyone of the incident. But she immediately told her roommate and phoned her brother, who was not at home. She then went with her roommate and Eddie Sardon to the defendant's house. Eddie asked the defendant if he had "forced himself to have intercourse" with the prosecutrix, and the defendant replied that he had but he was

sorry. He advised the prosecutrix not to tell her brother, because if she did one or both of them would get hurt. After they left the defendant, they went to her brother's house. Following that they went to a police station, but the station was not in their district and they were told to go to a hospital to get a doctor's statement. However, the hospital was crowded, so they left and reported to the police station in their own district. She was examined by a Dr. Prince, who was in the Army and stationed in Alabama at the time of trial. She said the doctor examined her and found "soreness." She signed a complaint the next day, April 18, 1952, but the defendant was not arrested until August 28, 1952.

She further testified that she first met the defendant on April 13, 1952, and had gone out with him, but always in the company of others. She denied ever having sexual intercourse with him prior to April 17, 1952.

Officer John Griffith, who was assigned to investigate the case on April 18, 1952, also testified for the prosecution. Upon receiving his assignment he proceeded to the defendant's last known address but did not find him. It was not until August 28, 1952, that the defendant was arrested and taken into custody. He was identified by the prosecutrix at a showup and taken to the State's Attorney's office for questioning. Officer Griffith was present during this interrogation and identified a document purporting to be the statement of the defendant taken at that time. This statement was received in evidence, the defense making no objection thereto. The statement was not signed by the defendant, a notation being added as follows: "William Tensley read statement and stated he did not want to sign same because some of the words were not in place and wanted to see a lawyer." It was nowhere contended by the defendant, however, that the statement was inaccurate in any particular in so far as it purported

to be a transcript of what he had said. Nor was it urged that he did not make the statement voluntarily.

In this statement the defendant admitted being out with the prosecutrix on April 17, 1952. He said he picked her up in his automobile and took her and two others to a friend's house. He drove the prosecutrix home and had sexual relations with her while the automobile was parked on Forty-fourth Street, but he denied that he forced her to have relations with him. Later that night he saw her at his home, where she was accompanied by the fellow to whom she is now married, Eddie Sardon, and the girl he was going with. This was approximately midnight. Eddie asked him what he did and told him "the girl says you raped her." He denied that he did.

The defense sought to establish an alibi for the defendant based upon the testimony of the defendant himself and Lucille Johnson.

Lucille Johnson testified that she saw the defendant on April 17, 1952, on two separate occasions. In the early part of the evening, maybe five or six o'clock, the defendant came to her home. He left right away and came back around nine or ten, at which time his wife was with him. The witness stated she was guessing at the time, but was certain it was not as late as midnight when he came back. She said her daughter, her son-in-law, the defendant and his wife played cards until real late, possibly three or four in the morning. She recalled the exact date because the defendant's wife said it was her birthday.

In his testimony the defendant, thirty-six years old and married, denied being with the prosecutrix at all on April 17, 1952. He said that April 14, 1952, three days before, was the last time he saw her. On this occasion, a date, he told the prosecutrix he and his wife were talking about going back together. He told her "By the way, if we go back together, you and I won't be seeing much of each

other." Whereupon the prosecutrix cried, told him she didn't want him to quit her and said she thought he was going to marry her. When she left him that night she said "If I can't have you no one will." He testified to having sexual relations with the prosecutrix on prior occasions but denied ever forcing her to have such relations.

The defendant's testimony as to his whereabouts on April 17, 1952, was as follows: He and his wife came in by bus from Michigan City, Indiana, at around five or six o'clock in the morning. That evening around three-thirty to four-thirty he went to Mrs. Johnson's house. After a short stay, he walked down the street to a tavern where he remained till about seven-thirty. He then walked back toward Mrs. Johnson's house, meeting his wife on the way. They went together to Mrs. Johnson's and stayed till around four-thirty in the morning.

The defendant's mother, Mattie Jones, and Sells Townsel also testified for the defense. The latter said he lived on the same floor of the apartment building as the defendant and during either May or June of 1952 met the prosecutrix in the defendant's apartment. He said he also saw the defendant and the prosecutrix together in his own room on a later occasion. He was not sure of the date, but said he knew it was in the summertime. On this occasion he left his apartment for about an hour while they were in the room, and upon returning found the bed had been rumpled up.

The testimony of the defendant's mother concerned an inquiry made of her at her home on April 17, 1952, by two police officers, who were looking for the defendant. They told her they were looking for him in connection with a petty theft. The witness said she saw the defendant later, asked what he had done, and he answered "nothing." She thought this was around seven or eight o'clock in the evening and said he was not there very long.

The first four allegations of error pertain to the sufficiency of the evidence.

It is fundamental that this court will not disturb a verdict of guilty on the ground that the evidence is not sufficient to convict, unless it is so palpably contrary to the verdict, or so unreasonable, improbable, or unsatisfactory as to justify the court in entertaining a reasonable doubt of the defendant's guilt. (*People* v. *Heaton*, 415 Ill. 43; *People* v. *Perez*, 412 Ill. 425.) Nor will we substitute our judgment for that of a jury, or of a judge sitting without a jury, in merely weighing the credibility of the witnesses, where the testimony is conflicting. *People* v. *Arnold*, 2 Ill. 2d 92; *People* v. *Biloche*, 414 Ill. 504; *People* v. *Renallo*, 410 Ill. 372; *People* v. *Sheppard*, 402 Ill. 411.

It is to be noted that the sole defense made by the defendant was one of alibi. He denied at the trial even being with the prosecutrix on the day of the alleged crime, April 17, 1952. However, in his statement, taken after his arrest and admitted in evidence without objection, he not only admitted being with her but related various details about their being together. For instance, he stated he had sexual relations with her while his car was parked on Forty-fourth Street. He further admitted that the prosecutrix and others came to his home around midnight that night and that he was there accused of having raped the prosecutrix earlier in the evening. Significantly, at the trial he did not claim that any part of the statement was erroneous or that he never made any of the remarks contained therein.

It thus appears that the defendant's testimony, as well as that of his principal alibi witness, was effectively impeached by a prior, uncontradicted statement of the defendant himself. Moreover, this statement, under the circumstances, provided substantial corroboration for the testimony of the prosecutrix.

There are further inconsistencies in the defendant's testimony which cause us to doubt the defendant's veracity at the trial and consequently accord little weight to said testimony. One such additional discrepancy may be observed, namely, the contradiction between the account given by the defendant of his whereabouts between 7:00 and 8:00 o'clock on the evening of the alleged crime and that of his mother, who was a defense witness.

It is clear that the evidence of the defense on the matter of alibi is not sufficient to cause reasonable doubt as to the fact that the defendant was with the prosecutrix on April 17, 1952. In addition, the testimony of the prosecutrix that he forced her against her will at that time to have sexual relations with him is uncontradicted.

While it does appear that there were other individuals whose testimony would have been helpful, and whose failure to testify was not accounted for, we cannot say that the evidence is insufficient to sustain the conviction.

Finally, the defendant contends that comments of the trial judge show that the defendant was not given the fair and impartial trial guaranteed by the constitution of the United States, and the constitution of the State of Illinois. The remarks of the trial judge complained of occurred during a colloquy with defense counsel after the defendant was found guilty. He stated, among other things of similar import, that the defendant was an "unmitigated liar" and he should have given him a more severe sentence. It is argued that such remarks indicate the trial judge did not endeavor to weigh the evidence and pass judgment on defendant's guilt based on competent evidence and show he was not an impartial trier of. the facts, thus depriving the defendant of a fair trial and amounting to a violation of due process of law.

We are of the opinion that the defendant's contention in this regard is without merit. We have reviewed the court's remarks, which were in large part occasioned by

defense counsel's persistence in arguing with the court, and do not believe it can be said they in any way indicate the court was not impartial. While it is probably true that more restraint would have been desirable, still, in view of the testimony adduced at the trial, we can well understand the strong feelings of the court against the defendant. The testimony was in sharp conflict, and it appears likely that some of it was untruthfully given. Indeed, as we have pointed out, the defendant's testimony was discredited in many particulars. That the court openly expressed after the trial what a reading of the record tends to bear out, does not mean the court was not an impartial trier of the facts.

*Judgment affirmed.*